## SHAMROCK OIL & GAS CORPORATION v. COFFEE et al.

### No. 10700.

Circuit Court of Appeals, Fifth Circuit.

Feb. 3, 1944.

Rehearing Denied March 17, 1944.

Ray C. Johnson and W. M. Sutton, both of Amarillo, Tex., for appellant.

Riley Strickland, of Amarillo, Tex., and James O. Cade, of Lubbock, Tex., for appellees.

Before SIBLEY, HOLMES, and WALLER, Circuit Judges.

**410**

WALLER, Circuit Judge.

Appellee, as lessor under two oil and gas leases covering lands in the sour gas area of Moore County, Texas, brought suit to recover the difference between the sum that had been paid plaintiff and a sum alleged to be due plaintiff, as royalty, from July 1, 1937, to December 31, 1942. The leases contain the following applicable royalty provisions: "B. On gas produced from said land and sold or used off the land, or in the manufacture of gasoline, including casinghead gas, the market price at the well of ⅛ of the gas so sold or used, provided that if and when lessee shall sell gas at the wells, lessor's royalty thereon shall be ⅛ of the amount realized from such sale."

The contentions are: (1) That the defendant during the period in question did not pay the plaintiff the market price at the well of the gas taken. (2) That if there was no established market price at the well, then the defendant had not paid the plaintiff the actual value of the gas at the well where taken.

Under the contract the defendant took the gas from wells which it had drilled on the plaintiff's land and transported same through the pipes of its gathering system to its plant. In the process of gathering and transporting gas from well to plant it becomes commingled with large volumes of similar gas from other wells. At the plant of the defendant the gas was used for manufacturing gasoline, butane, and propane. The residue was sold by the lessee principally to carbon black plants for utilization in the manufacture of carbon black. Defendant made monthly settlements with the plaintiff for the gas so produced in sums which it says represented the market price at the well of the gas produced. The correctness of the volume of gas produced is not involved. An interesting discussion of the Panhandle Gas Field, distinguishing the uses and properties of sweet and sour gas, is found in Consolidated Gas Utilities Corp. v. Thompson, D.C., 14 F.Supp. 318, and also, Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, to which reference is hereby made for a discussion of conditions and circumstances affecting the market of sour gas in the area of production at the time of making the contract here in question. Since making the contract here involved, plants have been erected for processing the raw sour gas into butane and propane in addition to gasoline and carbon black. The manufacture of carbon black has been made lawful and facilities have in recent years been established for such purpose in the area in question. Because of these added uses and facilities plaintiff insists that there is an added market value.

The lower court, in its oral opinion, after reviewing the situation at some length, concludes: "Laying aside the fact to a degree that there has been some transactions made that warranted a higher price, we think that for the greater period covered by this suit that that gas was *reasonably worth* and had a value, under the circumstances, of one cent per thousand cubic feet, and we think that during the past twelve months for the calendar year 1942, that recognition should be taken of the upsurge and uses of the products of natural gas, and that for the year 1942 a *fair price* would be something like $.014 per thousand cubic feet, and if the parties will figure out a judgment on that basis it will be the judgment of the Court." (Italics added.)

The court below, in its oral as well as its written findings, used the phrases "market price", "market value", and "reasonably worth" more or less interchangeably, and came to the conclusion that the gas was "reasonably worth and had a value" under the circumstances of $.01 per m. c. f. for a part of the period, and that "a fair price" would be something like $.014 per m. c. f. for the past twelve months.

The contract is that if Shamrock sold the gas at the mouth of the well the royalty owners would take their part of what it sold for. In the event the gas were used by Shamrock to make gasoline or otherwise, or was sold after being removed from the lease, the royalty owners were to have the "market price" at the mouth of the well. A little was sold to drillers and the like away from the lease, but it is negligible, and would fall under the market price provision. The great bulk of the gas was used to extract gasoline and butane, with the residue sold for carbon black. The "market price" at the well is, therefore, the only applicable contract provision.

■■ Market price is the price that is actually paid by buyers for the same commodity in the same market. It is not necessarily the same as "market value" or "fair market value" or "reasonable worth". Price can only be proved by actual transactions. Value or worth, which is often resorted to when there is no market price

provable, may be a matter of opinion. There may be wide difference between them.[1] The first inquiry here must be whether there was a market price. All the witnesses say that gas like this was bought at the mouth of the well continually in this field. A market price therefore existed and was admittedly proven by actual sales. Opinions and estimates, and particularly consideration of what the buyers could have paid or should have paid, are entirely irrelevant.

The sixth paragraph of the written findings of fact of the court below is as follows: "6. That the market relied upon by defendant to sustain *market value* from July 1, 1937 to date of trial was not a free, open and competitive market but was a suppressed market, and such distress price reflected by the use of the schedules adopted by the Natural Gasoline Association of America and the payment for the gasoline portion on the field or charcoal test rather than of actual recovery was not the regular or *fair market value* at the wells where produced. That the fair market value of said gas at the wells where produced in Moore County, Texas including the wells involved herein was 1¢ per m. c. f. during the period of time from July 1, 1937 to December 31, 1941, and was 1.4¢ per m. c. f. from January 1, 1942 to December 31, 1942." (Italics added.)

■ We are not clear as to exactly what the lower court meant in its references to "suppressed market" and "distress price". The history of the sour gas in the Panhandle Field is that the sour gas was for many years undesirable, that the supply greatly exceeded the demand, that millions of cubic feet were pumped into the air, but on the other hand the demand for sweet gas, also produced in great quantities in other sections of the Panhandle area, was much greater. If the court below in the use of the term "suppressed market" or "distress price" had reference to the above conditions and that it was a buyers' market, such findings are justified, by the experience of the area, but there is no evidence in the record to show that there was any combination, agreement, conspiracy, or confederation whatsoever among the buyers to suppress the market for sour gas. On the contrary, it appears that there was competition. The fact that the seller had to take what the buyer offered is not the question before the court, but the first question is were there sales at the well of sour gas in this area during the period? If sales were made, a market price is established. The sales, of course, must be comparable and under terms and conditions similar to the terms and conditions involved in the contract under consideration. If there have been such sales and a market price has been established, then opinions and estimates as to what the buyers could have paid or should have paid are entirely irrelevant to the establishment of market price.

There seems to be an inference in the sixth paragraph of the findings that a distressed and suppressed market was reflected by the "payment for the gasoline portion on the field or charcoal test rather than of actual recovery" and that such payment on such test "was not the regular or fair market value of said gas at the wells". This holding seems to confuse quality with market price. The charcoal or field test is solely to determine gasoline content of the gas at the well and has nothing to do with market price although it does have to do with quality and therefore to some extent affects aggregate *value*. However, the evidence as to any claimed inaccuracy of the field or charcoal test is too indefinite to support a judgment, in dollars and cents, grounded upon any such asserted inaccuracy in such charcoal test.

■ The parties here contracted to sell at market price. It is undisputed that there were numerous sales of sour gas at the well in the field all during the period, in view of which there was a market price for gas in the field. Such market price, in the absence of collusion, combination, conspiracy, or a combination in restraint of trade among the buyers, fixes the market price. The contract does not call for market value or what the gas is reasonably worth. It avails nothing to one who has agreed to sell his gas at the market price that the gas has an intrinsic or actual value greatly in excess of the market price. He would still be bound to his contract. In much of the tes-

---

[1] What this Court said in Arkansas Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924, text 927, had reference to the particular facts in that case wherein no market price was shown, as was admittedly done in the instant case, and in such a situation this court there held that "as applied to this case, the term 'market price' was interchangeable with the term 'market value' ", and that in such situations value could be shown by opinion evidence in an effort to fix market price.

timony in this case witnesses refer to actual value or potential market value, to the confusion of the court in its quest for the main fact, to-wit, market price.

Appellee concedes in his brief that the appellant had clearly established the fact that the average price paid for raw gas in the area during the period was from $.005 to $.008 per m. c. f. at the well. But, adopting and defending the lower court's view, he says that there was a pre-arrangement between the major buyers under the NGAA contract, and because of this NGAA contract there was a suppressed market, or a market not free, open, and competitive. The court below did not find that the NG AA form of contract was a monopolistic arrangement which unlawfully depressed the price, and that the defendant was a party to such arrangement. The evidence does not show that the NGAA contract was an agreement in restraint of trade but was merely an effort to suggest an uniform kind of contract to reflect the actual sales bases in use in the field. There is no proof that any buyer at any time was obligated to use this form of contract or to conform to it, and departures from it were frequent, but the vast majority, thinking that it afforded a fair and practicable basis, used this form. The NGAA contract was between the buyer and seller and not between the buyers. This form of contract was such that it facilitated the making of contracts, the ascertainment of the amount due, and settlement therefor on the basis of grades or qualities of gas as determined by gasoline content and the market price of gasoline. It also provided a method for determining in the field or at the well the gasoline content of gas purchased under the contract by a test developed by the Bureau of Mines, known as the charcoal test. There is testimony in the record that a settlement with the seller upon the basis of gasoline actually produced rather than a settlement on the basis of field tests would yield more to the seller. The making of the actual recovery test would be impossible where gasoline from various wells was taken into a collecting system and intermingled in the pipe line of the manufacturer in transporting the gas from the wells to the plant. The actual-production-of-gasoline-at-the-plant test could be used only when there was a separate pipe line from the well of each owner to the plant of the buyer, or some other special precautions taken to prevent commingling of gases of various sellers. The necessity for the construction of separate pipe lines would, of course, greatly increase the cost and thereby tend to lessen the price of the raw gas. This court held, in Armstrong v. Skelly Oil Co., 5 Cir., 55 F.2d 1066, 1067, that the field test was a fair method of ascertaining gasoline content.

The evidence clearly shows the existence of a market price, based on the elements or factors in the NGAA form, which price varied from time to time according to the gasoline content, the price of gasoline, and according to the current willingness of buyers to increase the percentages suggested in that form of contract, and their willingness since 1939 to add the element of saved butane and propane, as suggested in the form put out in 1939. The defendant made the field test accurately as far as the record shows. It added ten per cent in 1939 to the original percentages, and after 1939 when the butane market developed the defendant added fifteen per cent for the butane. The disposition of the residue gas was definitely shown to have been in accordance with what was done by all buyers in the area in respect to residue gas, and there was no irregularity or departure from market price as to it. As to the butanes or propanes, it is not shown that the defendant did not do as well by its lessor as the other buyers did.

The evidence shows that since 1930 there has never been a flat rate per thousand feet of gas at the mouth of the well paid by anybody for the reason that the gasoline content varied in the gas in different wells. Gasoline content was one of the main elements of value and due to its variability in different wells, as well as the fluctuation in the price of gasoline, the NGAA form of contract was evolved and put into practically universal use.

█ The testimony of gas producers who elected to have their gas processed for a share of the gas rather than to sell their gas to the plant, i.e., Shell-Sinclair Company, or purchasers under the Huber contracts, are not comparable and have little or no probative value.[2]

The test is not what Huber paid Burnett under a lease embracing over 6,000 acres of land in which both oil, sweet, and sour gas were found, and in which lease there were other provisions peculiar to that lease, but

---

[2] Arkansas Natural Gas Company v. Sartor, 5 Cir., 78 F.2d 924.

the question is, were other buyers, in the area in question, during the same periods, regularly paying more for gas of the same quality, delivered and handled under the same circumstances, than Shamrock was paying to the plaintiff? According to the admissions in the appellee's brief, the market price in the area was from $.005 to $.008 per m. c. f., and that Shamrock has paid this price to appellee. The only question left was whether or not such a price was depressed or suppressed by reason of combinations or conspiracies in restraint of trade. There is no proof of the latter.

From the foregoing considerations it is apparent that the lower court based its findings on the opinions of witnesses as to what the buyers ought to have paid rather than the market price called for by the contract. The court cannot make a new contract, nor, in the absence of collusion or combination in restraint of trade, can market price by judicial fiat be substituted for market price established by the trade.

The judgment below is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.