HEMUS & COMPANY, Kenneth W. Cory, and Paul Barenkamp, Plaintiffs,

v.

Frank HAWKINS, Inexco Oil Company and Natural Gas Pipeline Company of America, Defendants.

Civ. A. No. 75–H–1832.

United States District Court, S. D. Texas, Houston Division.

June 20, 1978.

Ronald G. Byrnes, Houston, Tex., Thomas M. Reavley, Austin, Tex., for plaintiffs.

Dennis M. Dylewski, Houston, Tex., for defendants.

## MEMORANDUM OPINION

COWAN, District Judge.

*Issue*

The key issue in this case is: What sales are properly considered .comparable in de-

termining the "market value" of gas dedicated to interstate commerce?

*Facts*

Plaintiffs are owners of a non-participating royalty interest in a 96-acre tract in the Leggett Field in Polk County, Texas. The lease creating plaintiffs' royalty interest was entered in 1961 and plaintiffs' acquired their non-participating royalty interest in 1973.

On December 10, 1973, Mitchell Energy Corporation (hereinafter "Mitchell"), North Central Oil Corporation (hereinafter "North Central") and Natural Gas Pipeline Company of America (hereinafter "Natural Gas") completed a gas well which commenced production on April 8, 1974. Mitchell and an affiliate own a 36.82765% interest in the well, Natural Gas owns 36.82765% interest in the well and North Central owns a 26.3447% interest in the well.

Mitchell and North Central sell their share of the gas in the intrastate market, and pay royalties essentially predicated upon the intrastate prices.

Natural Gas' share of the gas has, at all material times, been dedicated to interstate commerce and is sold at the regulated price set by the Federal Power Commission (now Federal Energy Regulatory Commission). Natural Gas has paid royalties upon its portion of the gas by computing them on the basis of the interstate price which in the most recent periods in question has been about one-fourth of the intrastate price.

Plaintiffs allege that Natural Gas has underpaid its royalty obligation. Natural Gas' obligation to pay royalty is predicated upon an obligation to pay royalty based upon the "market value" of the gas. "Market value," plaintiffs' experts contend, is properly predicated upon comparable sales in the intrastate market.

Defendants' principal witness is Jack K. Baumel, a qualified consultant natural gas engineer, with extensive experience in the evaluation of "market value" of natural gas. Baumel's principal position is that in the field in question there is both an intra-

state and an interstate market. He reasons that since Natural Gas' share of the product from the well in question is irrevocably, completely and permanently dedicated to interstate commerce, the only relevant market for the purpose of valuing Natural Gas' share of the gas is the interstate market. Baumel reasons, therefore, that the intrastate sales are not comparable and thus are not properly considered in determining the market value of Natural Gas' share of the gas.

Alternatively, Natural Gas asserts that "market value" may be determined by the use of a weighted average market value, taking into consideration prevailing prices of all current sales in the marketing area on a weighted basis. This alternate computation would consider both interstate and intrastate sales.

*Basic Conclusion*

The undersigned has concluded that under the authorities which govern this court, Mr. Baumel's primary position is essentially correct; therefore, from the facts as they exist here, interstate sales are comparable, and intrastate sales are not. Mr. Baumel's primary conclusions concerning market value are therefore consistent with and apply the proper standard.

The case at bar, in the undersigned's judgment, is controlled entirely by *Weymouth v. Colorado Interstate Gas Co.*, 367 F.2d 84 (5th Cir. 1966). Also significant because of the basic attitude demonstrated (but not for specific factual applicability) is *California v. Southland Royalty Co.*, —— U.S. ——, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978).

*Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866 (Sup.Ct.—Tex.1968) while a significant and related case, does not really address the key issue in this controversy, which is: What sales are really comparable?

The key issue before the Fifth Circuit in *Weymouth* was whether or not Judge Brewster, the trial court, had properly admitted in evidence the opinion of an expert witness who predicated his conclusion upon

prices paid by interstate pipeline companies in Potter and Moore Counties. On appeal, lessors contended that these sales to interstate pipeline companies were simply not comparable because the amounts paid by interstate pipeline companies were not the result of arm's-length bargaining in a free market.

Circuit Judge Brown writing for the Fifth Circuit panel held that the testimony of the lessee's expert, who predicated his opinion upon interstate sales, was admissible. In addition, he went further and stated that the traditional willing-buyer/willing-seller definition which Judge Brewster had given the jury relating to "market value" was "woefully over-simplified to the point of inaccuracy" because it failed to take into consideration the multiple and complex factors relevant in determining market value of gas sold for resale in interstate commerce. Rather than the traditional willing-buyer/willing-seller definition of market value, Judge Brown states that the test, in determining the "market value" of gas dedicated to intrastate commerce is:

· . . . What would a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC would approve the price (and price changes) and other terms and then issue the necessary certificate of public conveyance and necessity?

367 F.2d at 90.

In the case at bar, the only witness who has applied the rules enunciated by Judge Brown is Mr. Baumel on pages 344–348 of the trial transcript.

Plaintiffs' attempt to distinguish *Weymouth* on the ground that *Weymouth* is (plaintiffs argue) applicable only where the sole market outlet is a market outlet for interstate sale. In the case at bar, plaintiffs argue, there is obviously an intrastate outlet since two of the owners of the well market their product in intrastate commerce.

The undersigned cannot accept the plaintiffs' position for essentially two reasons:

1. While it is true that the opinion in *Weymouth* indicates that "substantially all" of the gas in question moved in interstate commerce, there is nothing in the three published opinions in *Weymouth* to indicate that 100% of the gas moved in interstate commerce, or that there were no intrastate sales in the area.

2. More important, however, is the fact that the gas in controversy here, that is, Natural Gas' share of the gas, is irrevocably committed to the interstate market. Natural Gas' share of the product, which is chemically identical to that of North Central and Mitchell is, however, conceptually and legally a totally different commodity.

Nothing which the Fifth Circuit said in *Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973) is inconsistent with or lessens the force of *Weymouth*. The court in *Placid Oil* simply recognizes that if lessor's "market value" litigation is successful in the state courts, the FPC has the power to consider an increased royalty as a cost in setting rates. *Placid Oil* does not touch on the critical inquiry here, which is: What are the comparable sales?

Similarly, *Texas Oil & Gas Corp. v. Vela, supra*, does not solve the problem presented by this case. That case merely dealt with a situation in which a lessee committed himself to a long term gas contract in which the prices set did not escalate over the years. The court held that lessee's failure to protect himself from escalating prices did not affect his obligation to pay "market value" to the royalty owner. The case did not, however, give guidance as to the method by which "market value" should be computed in the event of an enormous disparity between intrastate prices as compared to interstate prices.

Judge Sessions of the Western District of Texas has recently grappled with a similar problem in *Kingery v. Continental Oil Co.*, 434 F.Supp. 349 (W.D.Tex.1977). There are two ways in which *Kingery* is different

from the case at bar. Continental there apparently contended that payments to the lessor were governed solely by prices set in the gas sales contract between Continental Oil Co. and Transcontinental Gas Pipeline Corp. This argument was clearly inconsistent with *Vela*. Defendant here does not contend that its obligation to the plaintiffs is determined solely by any particular gas sales contract, but merely contends that since its share of the gas is committed to interstate commerce, its royalty obligation must be determined by the market value of gas which moves in interstate, rather than in intrastate commerce.

Judge Sessions said: ". . . the Court must next determine whether market value is limited by the amount which the Defendant received by virtue of the contract with Transcontinental. . . ." The undersigned need not make that determination. Natural Gas may not limit its payment to plaintiffs simply by reference to what it receives; however, it need not, under the undersigned's analysis of this problem, pay royalties predicated upon prices paid in the intrastate market.

*Kingery* is also distinguishable from the case at bar because the Kingery lease was executed before *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). Judge Sessions therefore predicated his holding upon a conclusion that lessor, in the Kingery lease, did not necessarily contemplate that royalty rates would be affected by regulation of the FPC because, pre-*Phillips*, no court had ever held that the Natural Gas Act gave the Federal Power Commission the authority to regulate contractual rates charged by producers selling gas to interstate pipelines. The lease in the case at bar was executed in 1961. Applying Justice White's reasoning in *California v. Southland Royalty Co., supra*, the lessor in the case at bar could have and was bound to contemplate that all or a portion of gas produced from wells drilled upon the property in question would be dedicated to interstate commerce, and that prices received by the producer if he sold the production to an interstate pipeline would in fact be subject to federal regula-

tion. Of course, the lessor and the lessee here in reality probably did not foresee (just as our society as a whole did not foresee) that an enormous disparity would develop between prices paid in interstate commerce as distinguished from the intrastate market. Nevertheless, applying Justice White's reasoning in *Southland Royalty Co.*, it must be concluded that the lessors had knowledge that their royalty might well be affected to some degree by federal regulation.

Continental in the *Kingery* case apparently merely reasserted the arguments rejected in *Vela*. Defendants' position here is more sophisticated, more intelligent and more compelling. Here, as the Court understands the case, defendant concedes that if it had been or is imprudent enough to commit itself to a long-term contract whereby defendant does not receive market value based upon interstate sales, it must still pay the plaintiffs a royalty based upon "market value," but that "market value" must be predicated upon comparable sales in the interstate market. Defendant's position here is, the undersigned believes, not inconsistent with the Supreme Court of Texas teaching in *Vela* or with Judge Sessions' conclusions in *Kingery, supra*.

The undersigned's conclusion here is inconsistent with the decision of the majority in *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1 (1977). The undersigned, after study of the comprehensive work of the Supreme Court of Kansas, finds the dissenting opinion of Justices Fromme, Prager and Miller more persuasive and consistent with the Fifth Circuit rule as enunciated in *Weymouth, supra*. Justice Fromme points out in his dissent that:

> . . . The majority opinion completely disregard the question of what evidence may be necessary to establish a 'market price' . . .

Any experienced eminent domain litigator knows that the key issue in most controversies relating to the "market value" of real property is: What are the comparable sales? Comparability can be determined

only by evidence as to the "highest and best use." Decisions as to the "highest and best use" frequently must depend upon the decisions of regulatory bodies, i. e., zoning commissions, navigation districts, or environmental regulatory commissions. The undersigned, after consideration of the authorities in this field, simply cannot conclude that there is any comparability between a sale in the intrastate market and a sale in the regulated interstate market. The gas here in question is committed to the interstate market. The key to this Court's decision is that sales in the intrastate market are simply not·comparable, and expert testimony predicated entirely upon such sales is not a reliable basis for decision.

The question is not one of a debate between federal v. state law. Texas courts have stringently insisted that proof of market value in eminent domain litigation be made only by the introduction of expert testimony based upon comparable sales.

Plaintiffs' position, however, has considerable philosophical and equitable merit. There is something basically repugnant about a conclusion that the "market value" of any commodity is determined by reference to a regulated price. A long-established, and rigidly enforced rule applicable to the determination of the market price or market value of real estate is that conveyances to entities having the power of eminent domain are not admissible in evidence for the purpose of determining market value. See, e. g., *Gomez Leon v. State*, 426 S.W.2d 562 (Tex.1968); *State v. Curtis*, 361 S.W.2d 448 (Tex.Civ.App.—San Antonio, 1962, writ ref. n. r. e.); *Menchaca v. San Antonio Independent School District*, 297 S.W.2d 363 (Tex.Civ.App.—Waco, 1956, writ dism'd). If this reasoning were controlling, plaintiffs' position would be correct and interstate sales would not be admissible for the determination of "market price" where there was both an intrastate and interstate market.

Justice Brennan puts the point succinctly where he states that:

. . . In a market economy, the value of any commodity is no more or less than the price arm's length bargainers agree on.

Justice Brennan, dissenting in *du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 97 S.Ct. 2229 at 2233, 53 L.Ed.2d 100 (1977).

The undersigned is persuaded, however, that *Weymouth, supra*, precludes this Court from adopting the philosophically attractive argument suggested above and asserted persuasively by plaintiffs and their conscientious and well-qualified expert witness.

While the facts of *California v. Southland Royalty Co., supra*, are not here relevant, Justice White's reasoning there is applicable. The essential holding of *California v. Southland Royalty* is that a lessee, operating under a lease which gave him a 50-year fixed term, who dedicated gas reserves to interstate commerce, bound the lessor even after the expiration of the lease. Justice White there said:

In any event, we perceive no unfairness in holding respondents, as lessors, responsible for continuation of the service until abandonment is obtained. Respondents were 'mineral lease owners who entered into a lease that permitted the lease holders to make interstate sales.' 54 F.P.C., at 920. They did not object when Gulf sought a certificate from the Commission. Indeed, as the Commission pointed out, Gulf may even have been under a duty to seek interstate purchasers for the gas. *Id.*, at 919. Gas leases are typically construed to include a duty diligently to develop and market, see, e. g., 5 H. Williams & C. Meyers, Oil and Gas Law, § 853 (1977), and at the time the certificate was sought the interstate market was the major outlet for gas, see *Atlantic Refining Co. v. Public Service Commission of New York*, 360 U.S. [378,] at 394, [79 S.Ct. 1246, 13 L.Ed.2d 1312]. *Having authorized Gulf to make interstate sales of gas, respondents could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market.* Cf. *Louisville & Nashville R. Co. v. Mottley*, 219

U.S. 467, 482, [31 S.Ct. 265, 55 L.Ed. 297] (1911).

*Collateral Issues*

The pleadings and briefs of the parties raise four collateral issues which will be dealt with in this portion of the Memorandum Opinion.

*Appropriateness of Weighted Average Market Value*

■ Before the development of the dramatic disparity between the prices paid in the intrastate market versus the interstate market, the weighted average price method undoubtedly had much validity. It would appear that this was Mr. Baumel's basic method employed in his testimony in the *Vela* case. With the development, however, of an enormous disparity between the intrastate market price and the interstate market price, the weighted average method would seem to have no validity. The undersigned concludes that interstate prices now are simply not comparable to intrastate prices. The interstate market is not comparable to the intrastate market. Averaging prices which are not comparable, therefore, is not a valid method of determining market value.

*Plaintiffs' Right to Royalty Rights in Both Condensate and Plant Products*

■ Natural Gas handles its share of the gas somewhat differently than does Mitchell or North Central. All of the gas is run through a field separator, which removes some of the liquids in the gas. All of the parties seem to concede that the plaintiffs are entitled to one-eighth of the market value of this condensate, which is sold to Scurlock Oil Company.

Mitchell and North Central then sell their gas in intrastate commerce and there is no controversy concerning plaintiffs' right to receive one-eighth of the price which Mitchell and North Central receive in the intrastate market.

Natural Gas takes its 36.82765% of the gas and runs it through a plant which removes additional liquids. Natural Gas simply wrings, at its plant, more condensate out of the gas and then sells a drier gas than do Mitchell and North Central. There is no reason, in the Court's judgment, why the plant product should be treated in anyway differently from the condensate which is removed at the field separator. Plaintiffs therefore are entitled to claim royalty rights in the plant products.

This conclusion is consistent with the construction which the parties themselves have placed on the transaction prior to this controversy. In view of the Court's conclusion concerning the method in which the market value of Natural Gas' portion of the gas is to be evaluated, this portion of the controversy would appear to be moot in any event.

*Have Plaintiffs Ratified the Pooling Provisions of the Leases?*

■ Plaintiffs are the owners of a nonparticipating royalty interest in a 96-acre tract. The 96-acre tract has, without the consent of the plaintiffs, been pooled into a larger unit. In addition, the plaintiffs have made various conveyances, primarily for the purpose of redistributing their interests among themselves. The cases cited by plaintiffs and plaintiffs' testimony with reference to ratification, the credibility of which this Court accepts and confirms, establish that there has been no ratification of the pooling provisions of the lease.

In addition, before this controversy, defendants had paid royalties upon the assumption that there had been no ratification of the pooling provisions of the lease, thus placing a construction upon these instruments which is persuasive and controlling.

*Are Plaintiffs to be Awarded Attorneys Fees?*

Plaintiffs seek attorneys fees pursuant to Art. 2226, V.A.T.S., as construed in *Texas Gas Corp. v. Hankamer*, 326 S.W.2d 944 (Tex.Civ.App.—1959, error ref. n. r. e.)

■ This case is not one like *Texas Gas Corp. v. Hankamer*, in which a producer,

who owned the gas, agreed to sell the gas to a purchaser. On the contrary, this case is one to enforce a contractual right. Attorneys fees are not recoverable in a cause of action to recover for breach of contract.

In order, however, to enable the Court of Appeals to enter a final judgment in this case in the event the undersigned's analysis is mistaken, the Court will make findings of fact concerning reasonable attorneys fees on the basis of the evidence adduced. In this connection, the Court accepts the credibility, reliability and accuracy of the testimony offered concerning attorneys fees, both with reference to the hourly rate at which such fees should be computed and the number of hours reasonably and properly devoted to the handling of this matter by counsel for plaintiffs.

*Detailed Findings of Fact*

Plaintiffs are directed to prepare and file with the Court within 30 days, or within such shorter time as may seem to them to be appropriate, a complete and comprehensive set of proposed findings of fact consistent with the Court's conclusion that judgment should be entered that defendants take nothing in connection with their counterclaim and in connection with the Court's findings of fact relating to the amount of attorneys fees which would be appropriate if attorneys fees were properly awarded under law.

Defendant is instructed to prepare and file with the Court within 30 days, or within such shorter time as may be appropriate, a complete set of proposed findings of fact consistent with the Court's conclusion that judgment should be entered that plaintiffs take nothing by their case in chief and consistent with the conclusion that defendants' witness Baumel has applied the proper standards in his determination of market value.

Upon receipt of these proposed findings of fact, the Court will make such modifications in them as seem to the Court appropriate and will enter a judgment that plaintiffs take nothing from defendants, that defendants take nothing on their counter-claim, that future royalties be computed on Natural Gas' share of the gas in question on the basis of the interstate market so long as the present enormous disparity between intrastate and interstate prices continues. Costs will be assessed equally against plaintiffs and defendants.

Each party will also prepare and file within 30 days a proposed form of judgment consistent with the conclusions stated herein.